Opinion of the court by
Catron, Judge.
The controversy rests upon the boundary of a grant for 3840 acres, to captain Thomas Armstrong, surveyed 1785, and granted in 1786; lying west of the West Fork of Stone’s river, about one mile from the river, to include two springs. Beginning at two dogwoods and a hickory; thence south 1050 poles, to an ash and two mulberries; thence west 585¿ poles, to a stake; thence north 1050 poles, to a stake; thence east 5854 poles, to the beginning. Part of the grant was owned by Searcy and Nechard. In 1803, Hugh Robertson, a Surveyor, was employed by Searcy and Nechard, to lay off three 640 acre tracts on the west boundary of the 3840 acre tract. He began on the beginning corner A, on the annexed plat; run and plainly marked the line A, B and C; — he also run and marked the western boundary, C, D, E and F; then run east and plainly marked the southern boundary to G, where he stopped; and then run the line north, through the centre of the tract, G, H, I and B. This line was also plainly marked, corners at C, I, and F. The courses and distances were carefnlly run from A to C, and from E to F. From that time forth, the exterior lines thus marked were well known and reputed as the lines of Armstrong’s grant. No old lines were found, nor is it pretended any existed, on the north, west and south of the tract. The 640 acre tracts fell into the hands of purchasers, who cleared up to the line marked by Robertson, planted orchards, and made a burying ground adjoining the west boundary. From the beginning A, south to K, there was, as early as 1808, found an old marked line, and another *497 -made, apparently, two or three The old marks were thinly set of marks were recen t,years previous to 1808. made, but could he followedthe new marks were more numerous. At K, stands a post-oak, marked as a corner for Armstrong’s grant.
Robert Hays was the Surveyor of Armstrong’s claim in 1785. In 1812, he went to the beginning corner and identified it as the one he made. This corner stands about two poles west of the western line, extending further north and south than Armstrong’s corners A K. Ly-tle’s line was traced south, and at about the distance of 1096 poles two Mulberries were found at J in Lytle’s line, of the same age, marked as corners with chops north west. They stand about twelve yards apart. Hays made affidavit he believed this to be the true corner, no other being found. The affidavit was made on the request of the owners on the eastern boundary. No doubt Colonel Hays believed as he stated, yet the owners of the land had doubts and entered the land between the line A K and Lytle’s line, marked with dots on the plat. Colonel Hays states his belief, not that he recollected the fact that he did mark the Mulberries. To run the grant from A to F, and then run to the needle the other lines of the tract, and the dotted lines will be the boundary. The last line will be only 5561 poles long, instead of 585i, and will not give the quantity of acres called for in the grant. Immediately after Hays’ examination, Davis entered the lands between the black lines and dotted lines, on the west and north, got a grant, and in 1816 brought this suit against Smith and Tapley. On the trial below, they relied upon the marking of Robertson in 1803, as the true boundary. Before Davis entered, the black lines were plainly marked, decidedly claimed, known and recognized as the true boundary of Armstrong’s grant, by the owners and the community. Was this a valid re-marking, within the decisions confirming boundaries recently fixed where none were originally made? This depends upon the fact whether Robertson’,s survey was in reasonable conformity with The black linea strictly pursue its the calls of the grant *498 calls, and it cannot be perceived by what measure of justice the state could be allowed to disturb them. But the circuit court charged the jury, that the survey must conform, not stand opposed, to the calls of the grant, that if the Mulberries on Lytle’s line were the original and marked south east corner, then the presumption upon which the doctrine of re-marking stands, was rebutted; — • the presumption being, that the new lines are a renewal of the old ones. This corner being fixed by proof, in opposition to the new marks, all the other lines must conform to the first with reasonable certainty. The charge resulted in this: that if the jury found the Mulberries the original south-east corner, then the dotted lines were the true boundary of Armstrong’s grant, and the plaintiffs should recover. The jury found accordingly. Was the law correctly charged? I think clearly not. Lytle’s line is not called for in the grant; the beginning corner does not stand in it; Robertson reasonably disregarded it and pursued course and distance. He acted as every sensible man would haye done, looking alone to the calls of Armstrong’s grant, and if any marks were found south from the beginning, they were due south. Suppose he had found the Mulberries and known them to he a corner, still had run every line, except the first, to the cardinal points, could the re-marking be disregarded? I think not. It was in 1803 unsettled that all other lines should conform in their course to a marked line of the date of the survey. It was a matter of great doubt and much difficulty even up to 1823, when the cause of Sevier vs. Wilson was decided; (Peck’s Rep. 146) and that from the termination of the distance on the third line to the beginning, should be a direct course; disregarding course and distance, was not settled as law till, in M’Nairy vs. Hightower, (2 Ten. Rep. 303.) Robertson therefore, reasonably and honestly could (and did beyond doubt) fix the corners at A C and F. The cause of Houston vs. Pillow and Thomas presented the same question, and in a much more imposing form, at this term, and that Porter, the surveyor, run three of the lines in reasonable conformity we do not doubt.
*499 But for another and mofe conclusive reason, the charge was incorrect. After Armstrong’s grant was plainly marked out, in 1803 the owners thereof were estopped to disclaim the boundary themselves had fixed. Estoppels are mutual. The state and grantee were equally bound.— Comyn’s Digest, Estoppel B. The doctrine of re-marking has been settled rather on the foot of argument as to boundary, and estoppel to claim the one newly marked, than upon the presumption of renewing old marks. Owing to the Indian war, and the extreme danger of making actual surveys during that war, we know it for a certain truth that in most instances lines were not marked. The same mode was resorted to between the state and grantee, that would of necessity have been adopted by individuals under similar circumstances. Suppose A had owned the military district, he had sold to Capt. Armstrong 3840 acres, sent Colonel Iiays to lay it off in 1785, who had marked the beginning, and slightly the south east corner. In 1803, Capt. Armstrong had represented to A that he could find no lines, or boundary marked but the beginning corner. Take Hugh Robertson as surveyor, says A, and mark out the land I conveyed to you in 1786, in reasonable conformity to my deed, pursuing course and distance by the compass and chain. Armstrong did so.— Between 1803 and 1812, A sells and conveys all the lands adjoining on the south, west and north, up to the marked lines. In 1812 Capt. Armstrong says to A, my original south east corner is found different from where I had it bnarked in 1803. — I will hold to this corner, and square my other lines to it. This might have produced a dozen law suits. The statute of frauds does not stand in the way oi fixing a doubtful boundary by parol — decided in Huston vs. Mathews, by this court in the year 1826. This agreement would have bound the individuals, parties to it. So was the decision in the case cited. The parties are mutually estopped to disaffirm the boundary thus honestly and fairly made. The state and her grantee hold the same relation, and the same measure of justice applies— so it was decided in Clark’s lessee vs. M’Elhanie, at Spar *500 ta. Clark had an old grant for 640 acres, calling to begin about one mile west of the mouth of the Calf-Killer at a black oak.
The tree was searched for but not found. A surveyor, -n 0f Clark began a mile west from the mouth of the Calf.Killer, and plainly marked out the 640 acre grant, pursuing course and distance. M’Elhanie entered an occupant claim on the western boundary, thus marked, and had it granted. Presently the original beginning corner of Clark was found, standing west of the one mile post. To run out the grant from this corner would include M’-Elhanie, who was sued in ejectment by Clark. The supreme court declared Clark estopped to disavow his latter survey, or prove his boundary different, to the prejudice of M’Elhanie’s younger grant.
The causes of M’Lemore vs. Brown, and Brown vs. the Surveyor of the 10th district decided the same principle. The Hatchy connexion was many miles long and several wide. The southern boundary had been run and marked originally, but no other line. By virtue of the act of 1809 sec.8, Murray, the surveyor, had run the south boundary and found several corners on it as he progressed *501 east, but got south of the old line, and made new corners for miles on the eastern part. Presently the old corners were found, which would have changed the iorm of Murray’s survey, had they been gone to. Brown entered the land this change would have produced. M’Lemore and others resisted the entry, on the ground that the grantees and the state were bound by Murray’s survey — the court so adjudged and ordered Brown’s entry to be vacated.— The cause of Clarke vs. M’Elhanie was decided before 1819. Some of those who were concerned in framing the land law of that year, were counsel in the cause, and no doubt pursued the statutory-principle the decision proceeded upon — the true one to govern making lines to bound granted land — it is believed. The judgment will be reversed, and the cause remanded for another trial.

*500

James Rucks & G. S. Yerger, for Davis’ lessee.
O. B. Hays, for Smith and Tapley.
Peck, Judge, dissented.